**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| Dr. Edward M. Barksdale, Jr.<br><br>Plaintiff,<br><br>v.<br><br>University Hospitals Health System, Inc. and<br>University Hospitals Medical Group, Inc.<br><br>Defendants. | ) | Case No. _______________<br><br><br><br><br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff Dr. Edward M. Barksdale, Jr. ("Dr. Barksdale" or "Plaintiff"), by and through his attorneys Stowell & Friedman, Ltd. and Charna E. Sherman Law Offices Co., LPA, hereby files this Complaint against Defendants University Hospitals Health System, Inc. and University Hospital Medical Group, Inc. (collectively, "Defendants" or "UH") and alleges as follows:

1. Plaintiff Dr. Barksdale is one of the most highly regarded pediatric surgeons in the United States. Defendant UH hired Dr. Barksdale in 2007. From 2011 until his constructive discharge in 2024, Dr. Barksdale served as Surgeon-in-Chief of Rainbow Babies and Children's Hospital ("RBC"). Dr. Barksdale is, and was throughout his tenure, the only Black male physician of the many hundreds of doctors employed at RBC.

2. Dr. Barksdale's tenure at RBC was marked by incredible accomplishments for his young patients, whose lives he saved or improved with his surgical experience and skill; for his community of Northeast Ohio, where he spearheaded an innovative, highly praised, award-winning, and life-saving hospital-based violence intervention program; and for the pediatric surgery profession, as demonstrated by his successful tenure as President of the American

Pediatric Surgery Association, which is the nation's largest and most important professional organization of pediatric surgeons.

3. Despite his undeniable accomplishments for his patients, his community, and his profession, UH subjected Dr. Barksdale to relentless anti-Black discrimination and racist harassment. Within the halls of RBC, where he performed thousands of life-changing and life-saving surgeries on infants, children, and teenagers, Dr. Barksdale was treated as other, less-than because of the color of his skin. His colleagues regularly subjected him to racially hostile comments and actions based on ugly racist stereotypes. Over the course of years, Dr. Barksdale repeatedly complained to the highest levels of the hospital's administration about the racial harassment he regularly faced from colleagues and staff, in the operating room and elsewhere. Rather than addressing Dr. Barksdale's concerns and ensuring a work environment free from racist harassment, UH's leadership instead embarked on a campaign of relentless further discrimination and retaliation against Dr. Barksdale.

4. Dr. Barksdale grew up in segregated Lynchburg, Virginia. His parents were civil rights activists who worked directly with Dr. Martin Luther King, Jr. to help bring the era of *de jure* racial segregation to an end. Despite Dr. Barksdale's remarkable record of accomplishment and success, UH's treatment of him, its racial discrimination and harassment of him, and its retaliation against him for daring to challenge the unacceptable status quo, starkly illustrates that the work of achieving racial equality in the United States remains unfinished. Dr. Barksdale brings this action to hold UH accountable for racially discriminating against him, subjecting him to a hostile work environment, and unlawfully retaliating against him.

## PARTIES, JURISDICTION AND VENUE

5. Plaintiff's claims arise under 42 U.S.C. § 1981.[1] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6. Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. § 1391 because Defendant is located in Cleveland, Ohio, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

7. Both entities collectively referred to as UH are Ohio non-profit corporations with their principal places of business in Cuyahoga County, Ohio.

8. UH owns and runs 21 hospitals, more than 50 health centers, and more than 200 physician offices throughout Northeast Ohio. UH has tens of thousands of employees and is one of Northeast Ohio's largest employers.

9. Plaintiff and Defendants entered into a standstill agreement to toll the relevant statutes of limitations. Accordingly, Plaintiff's claims are timely filed.

## FACTUAL ALLEGATIONS

10. Plaintiff Dr. Edward M. Barksdale, Jr. is one of the nation's most accomplished and well-respected pediatric surgeons.

11. Dr. Barksdale grew up in Lynchburg, Virginia at a time when racial segregation was the law in the state. His family filed suit to achieve desegregation of Lynchburg's schools. To support the family's efforts to open Lynchburg's schools to all students, regardless of race, Dr. Martin Luther King, Jr. visited Dr. Barksdale's family's home when he was a child. Along

[1] Plaintiff intends to file a charge of discrimination with the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission. Plaintiff intends to amend his complaint to add claims under Title VII and Ohio anti-discrimination law once he has completed the administrative process.

with his sister, Dr. Barksdale was one of the first African Americans to attend previously all-white schools in Lynchburg, Virginia.

12. Dr. Barksdale attended Yale University, where he obtained a Bachelor of Science degree in biology. He then graduated from Harvard Medical School. He completed his residency in general surgery and a pediatric surgery research fellowship at Massachusetts General Hospital. There, he became the first African American to serve as the prestigious Chief of the West Surgery Service.

13. Dr. Barksdale continued his residency training in pediatric surgery at the University of Cincinnati Children's Hospital. Dr. Barksdale was the first Black pediatric surgery resident at the University of Cincinnati, and one of the first few African American pediatric surgery trainees in the United States. Dr. Barksdale then spent more than a decade as an attending physician at the Children's Hospital of Pittsburgh.

14. In addition to his work directly providing care for children and teenagers, Dr. Barksdale is also a distinguished researcher and professor. Dr. Barksdale has authored dozens of peer-reviewed journal articles and book chapters and has been invited to present at meetings and conferences across the country. Dr. Barksdale has received the highest honor for surgical educators and was inducted into the Academy of Master Surgeon Educators. Dr. Barksdale has also received the most important award for medical educators at Case Western University. In addition, he has taught and mentored countless young surgeons, who have, among other things, become Presidential appointees to high-level federal health positions, deans of top medical schools, and fellow leaders of the surgical community.

15. In 2007, UH offered, and Dr. Barksdale accepted, the position of Division Chief at Rainbow Babies and Children's Hospital. In 2011, UH named Dr. Barksdale Surgeon-in-Chief of RBC. In addition, Dr. Barksdale served as Division Chief, Pediatric Surgery, UH Cleveland

Medical Center and as the Division Chief, Pediatric General and Thoracic Surgery at UH Rainbow Babies and Children's Hospital. He held the Robert J. Izant, Jr., MD, Endowed Chair in Pediatric Surgery and was a professor of surgery and pediatrics at Case Western Reserve University School of Medicine.

16. In May 2024, due to the discrimination and retaliation described below, UH constructively discharged Dr. Barksdale. He announced his resignation with 120 days' notice, to take effect in September 2024.

17. In 2012, Patti DePompei ("DePompei") was named the President of RBC and became Dr. Barksdale's direct supervisor. DePompei confided in a mutual confidante that she "did not like [Dr. Barksdale] from the day she first saw him." DePompei's immediate animosity and hostility towards Dr. Barksdale was based on his race, Black.

**UH Underpays Dr. Barksdale Based on His Race**

18. As a successful and highly productive Surgeon-in-Chief of a major, nationally recognized hospital, Dr. Barksdale's pay was far below similarly situated non-Black counterparts in the state, region, and country. Similarly situated non-Black Surgeons-in-Chief at major Ohio hospitals made seven figures in annual compensation, while Dr. Barksdale's compensation never approached that amount. A compensation study revealed that Dr. Barksdale was in approximately the 25th percentile nationally for those in similar roles, while his surgical productivity was above the 75th percentile.

19. Dr. Barksdale repeatedly raised concerns to DePompei about his inequitable pay. DePompei responded not only by refusing to consider increasing Dr. Barksdale's compensation, but by accusing Dr. Barksdale of being selfish and not a "team player," because he asked to be paid in line with his peers. In fact, not only did UH refuse to pay Dr. Barksdale an appropriate

salary comparable to his non-Black counterparts in the state, region, and country, but it refused to increase his compensation *at all* for a period of more than seven years.

**UH Attacks Dr. Barksdale for Establishing an Innovative Program Designed to Help (Mostly Black and Brown) Victims of Violence in the Cleveland Area**

20. In his role as Surgeon-in-Chief, Dr. Barksdale was personally and profoundly affected by the surge in violence affecting young people in the Cleveland area in the mid-2010s. He treated and operated on numerous young children and adolescents affected by interpersonal or community violence in and near Cleveland. Unwilling to accept the unacceptable status quo, and recognizing that the cycle of violence and trauma required interventions beyond scalpels and sutures, Dr. Barksdale helped devise the Antifragility Initiative—a novel, holistic, person-centered violence intervention program, designed to thwart youth violence, combat the downstream effects of severe trauma, and encourage post-traumatic growth. Then-Attorney General of Ohio, Mike DeWine, described the Antifragility Initiative as the "the most innovative social innovation program [he] had ever seen." Thanks to Dr. Barksdale's efforts, UH was awarded a grant of more than $670,000 to fund the Antifragility Initiative and serve young victims of violence.

21. However, rather than celebrating Dr. Barksdale's accomplishment, and working with him to implement an innovative program designed to help the most vulnerable (and primarily Black and Brown) members of the community RBC served, RBC's leadership instead relentlessly attacked Dr. Barksdale. From late 2018 through June 2019, RBC's leadership, including DePompei, Chief of Pediatrics Dr. Marlene Miller ("Dr. Miller") and UH President Dan Simon ("Dr. Simon") subjected Dr. Barksdale to a series of hostile meetings condemning Dr. Barksdale for pursuing the Antifragility Initiative. RBC's leadership team tried to pressure Dr. Barksdale to step away from the program he had designed and championed, and to turn over

the grant to white practitioners who had no involvement in creating or developing the Antifragility Initiative.

22. The hostile behavior towards Dr. Barksdale and the Antifragility Initiative culminated in a meeting on June 12, 2019. In rude, condescending, and intimidating fashion, Dr. Simon derided Dr. Barksdale and the "little violence grant" he had received. Dr. Simon demonstrated contempt for Dr. Barksdale and his efforts—celebrated and awarded by the State of Ohio—to attempt to provide support to young people (mostly people of color) traumatized physically and emotionally by violence in their communities.

23. The day after the June 12 meeting, one of the attendees reached out to Dr. Barksdale. This attendee explained that, in the course of their 25-year friendship, he had never seen Dr. Simon act in such a rude, intimidating, and hostile manner to anyone. He apologized for not speaking up in the face of Dr. Simon's inappropriate behavior.

24. Dr. Barksdale steadfastly resisted ceding control of the Antifragility Initiative and giving up the grant to other (white) colleagues. In response, UH's leadership escalated its efforts to intimidate and bully Dr. Barksdale. In particular, Dr. Simon demanded that Dr. Barksdale step down from his leadership role as Surgeon-in-Chief because, he contended, Dr. Barksdale had failed to grow pediatric surgery and lacked a national profile. These accusations were completely wrong.

25. In a subsequent meeting, Dr. Barksdale provided data to Dr. Simon that showed the growth of the pediatric surgery department under Dr. Barksdale's leadership, his impressive clinical productivity, outstanding patient approval rating, and other information demonstrating his strong leadership of RBC's pediatric surgery program. In addition, Dr. Barksdale refuted the absurd notion that he lacked a sufficient national profile to serve as RBC's Surgeon-in-Chief. In particular, Dr. Barksdale explained that he was the President-Elect of the American Pediatric

Surgery Association, the largest and most important professional organization of pediatric surgeons. Similarly, Dr. Barksdale had recently hosted the Lilliputian Surgery Society, an elite group of 50 colleagues—including fellow Surgeons-in-Chiefs, Chief Medical Officers, Hospital CEOs, and Deans—for a successful three-day continuing education and networking event.

26. In response to Dr. Barksdale's explanation of his stellar leadership of RBC's pediatric surgery program and his prominent national leadership, Dr. Simon sheepishly admitted that he was not personally familiar with the facts, and that he had simply relied on what DePompei told him about Dr. Barksdale's purported failures and lack of national stature.

**<u>Dr. Barksdale's Colleagues Racially Harass Him; UH's Leadership Does Not Address the Situation, Except by Further Discriminating and Retaliating Against Dr. Barksdale</u>**

27. As the only Black male physician at RBC, Dr. Barksdale was regularly, throughout his tenure, subjected to hostile comments and actions based on racial stereotypes. For example, colleagues have remarked that "when [Dr. Barksdale] speaks, it sounds like the words should be coming from someone else," that he is "too articulate," and that when he speaks he is "much more gentle and soft spoken then I would imagine by looking at him." These kinds of comments are based on stereotypical views about Black men and remind Dr. Barksdale that, when his colleagues perceived him, they primarily sawa Black man—not a nationally renowned physician, surgeon, and humanitarian.

28. In January 2020, a 12-year-old patient was scheduled for a surgery on an ovarian cyst. RBC's established policies required that a pediatric surgeon be present for surgeries involving children younger than 16 years old. A white female doctor, Dr. Megan Billow, nonetheless sought to perform the surgery without a pediatric surgeon present. Via email, Dr. Barksdale politely reminded Dr. Billow of the hospital policies requiring the presence of a

pediatric surgeon, and one of Dr. Barksdale's pediatric surgeon colleagues was present for the surgery.

29. Prior to the surgery, Dr. Billow and several white nurses commiserated openly about Dr. Barksdale and accused him of being a racist and hating white women. Later, after the surgery, this discussion continued among Dr. Billow and a group of white OB/GYNs, who also openly accused Dr. Barksdale of being a racist and hating white people.

30. A witness to these discussions mistakenly emailed Dr. Barksdale's son (who has the same name) regarding these comments. When the email was shared with Dr. Barksdale, he felt devastated. Dr. Barksdale has devoted his life and career to building bridges, to working for the betterment of humanity alongside, and for, people of all racial, ethnic, and religious backgrounds. Further, from the time his family desegregated his elementary school in Lynchburg, Virginia, to Yale, Harvard Medical School, Massachusetts General Hospital, and ultimately RBC, Dr. Barksdale has thrived in spaces and institutions where the vast majority of people are white. He has formed lifelong connections, friendships, and productive work relationships at all these locations, with women and men of all races. In that context, the notion that colleagues Dr. Barksdale barely knew not only viewed him as racist against white people, but felt comfortable openly expressing that sentiment in the workplace, was extremely upsetting to him. Moreover, the fact that he had barely interacted with these colleagues made clear that their accusations were based purely on the color of his skin.

31. Dr. Barksdale repeatedly raised concerns about his colleagues' racially hostile accusations to his supervisor, DePompei, and other members of hospital leadership. In response, DePompei displayed indifference to Dr. Barksdale's concerns about RBC's racially hostile work environment.

32. Upset by DePompei's inaction and indifference to his complaints of racial hostility, Dr. Barksdale reached out to a mutual confidante of his and DePompei's. The confidante responded: "Ed, I thought you knew. [DePompei] told me that she did not like you from the day she first saw you."

33. In March 2020, DePompei held a meeting with representatives of pediatric surgery and the OB/GYN department. At the meeting, the policy requiring the presence of a pediatric surgeon in surgeries involving children was discussed and reaffirmed. During the meeting, Dr. Barksdale directly discussed his concerns and discomfort about members of the OB/GYN department accusing him of being racist against white women. After Dr. Barksdale raised these concerns, one of the OB/GYN representatives, Dr. Nancy Cossler, became red-faced and angrily denied that she, personally, had accused Dr. Barksdale of being racist against white people. Dr. Cossler's behavior was so bizarre that DePompei later asked Dr. Barksdale if he had previously had any negative interactions with Dr. Cossler. Dr. Barksdale answered no. DePompei promised (falsely) to investigate the matter further.

34. Shortly after Dr. Barksdale raised concerns to hospital leadership about the racial hostility he faced, the COVID-19 pandemic emerged. The State of Ohio set up a weekly state-wide planning meeting to discuss and strategize regarding the pandemic and measures to limit the spread and harm caused by COVID-19. Surgeons-in-Chief from across the state participated in these calls. In addition to his role as Surgeon-in-Chief, and his national profile, Dr. Barksdale has a long record of assisting governments on health-related issues, including advising one of Ohio's Senators and the Mayor of Cleveland. In addition, and as RBC leadership knew, Dr. Barksdale had a particularly strong interest on issues relating to racial and economic health disparities. But, as the COVID-19 pandemic swept the country and Ohio, devastating low-income communities of color in particular, RBC forced Dr. Barksdale to the sidelines. In a

blatant act of further discrimination and retaliation, RBC's leadership barred Dr. Barksdale from participating in these planning calls, instead choosing a junior white colleague of Dr. Barksdale's to represent the hospital.

35. In August 2021, Dr. Barksdale, DePompei and Dr. Simon attended a Board of Trustees meeting. At that meeting, despite Dr. Barksdale's nearly four decades as a physician and his role as Surgeon-in-Chief of the hospital, the white chair of RBC's Board of Trustees referred to Dr. Barksdale as "Mr." Barksdale. DePompei sent a text message to Dr. Barksdale making light of the situation, but she and Dr. Simon refused to speak up or correct the Board chair and remind him that Dr. Barksdale was a physician.

36. On September 1, 2021, at a meeting with DePompei, Dr. Barksdale again raised concerns about the racial hostility he faced at RBC. He discussed his disappointment that DePompei and Dr. Simon acted as bystanders to racial stereotyping, rather than upstanders, when they refused to correct the Chair of RBC's Board and explain that Dr. Barksdale was a physician. He described various incidents of racial hostility he faced as the sole Black male physician at RBC. He described feeling unsafe in the operating room in situations where he knew others in the operating room possessed race-based animus towards him. He explained his pain and disappointment that nothing was done to address or correct the situation after Dr. Billow and other white colleagues openly accused him of being racist. DePompei responded initially by claiming she had forgotten about the situation.

37. On September 7, 2021, Dr. Barksdale attended a meeting with RBC's CEO Cliff Megerian. Dr. Barksdale reiterated his concerns about the racially hostile environment at RBC. He again described his disappointment that no one spoke up on his behalf after RBC's Board Chair referred to him as "Mr." He referenced George Floyd's murder, and the fact that bystanders did nothing to intervene. He described how his colleagues had openly accused of him

being racist and hating white people, and how he had brought his concerns to DePompei, who did nothing about it.

38. Rather than responding to or productively addressing Dr. Barksdale's concerns regarding anti-Black racial hostility at the hospital, RBC's leadership instead embarked on a retaliatory and discriminatory campaign to seek out a pretext to remove him as Surgeon-in-Chief. Shortly after Dr. Barksdale's meetings with DePompei and Megerian, in which he reported and challenged racial discrimination and hostility, DePompei initiated an "audit" of Dr. Barksdale's leadership. Dr. Robert Sawin was engaged to perform this audit.

39. Dr. Sawin informed Dr. Barksdale that DePompei and Dr. Miller made many disparaging comments to him about Dr. Barksdale's demeanor, leadership, and character. In addition, Dr. Sawin emphasized that no information about Dr. Barksdale's successes, accomplishments, or awards had been provided to him. It became clear to Dr. Barksdale that—instead of addressing and remedying the racial hostility Dr. Barksdale reported—DePompei and RBC leadership believed the solution was to fire the sole Black male physician at RBC, and only Black physician in leadership, who complained regarding racial discrimination and hostility.

40. The audit progressed. At the end of the year, Dr. Barksdale received a calendar invitation for a meeting with human resources in early January 2022. Dr. Barksdale understood that the purpose of this meeting was to discuss his firing as Surgeon-in-Chief. However, RBC and DePompei's plan did not come to fruition, because—a few days before Dr. Barksdale's discriminatory and retaliatory firing was to be implemented—the auditor, Dr. Sawin, informed DePompei that he did not believe there was a legitimate basis for firing Dr. Barksdale. The human resources meeting was abruptly canceled without explanation and never rescheduled.

41. The behavior of RBC's leadership, including and especially DePompei, caused Dr. Barksdale extreme emotional distress. As a result of DePompei and RBC's leadership's

actions, Dr. Barksdale realized that not only would he continue to face unfettered racial hostility and harassment in the operating room, but that any efforts to combat this situation or protect himself would be held against him, jeopardizing his career and the position he had worked for decades to secure.

42. After the failed effort to fire Dr. Barksdale based on Dr. Sawin's audit, RBC pivoted to a new strategy to force Dr. Barksdale out of the organization. RBC's human resources department worked with a group of nurses to prepare a human resources complaint against Dr. Barksdale. On April 13, 2022, DePompei and a human resources employee called Dr. Barksdale into a meeting to discuss the substance of the complaint. There were two themes of the complaint. First, the nurses believed that they knew better than Dr. Barksdale—the hospital's Surgeon-in-Chief—regarding surgical practices, and that Dr. Barksdale should be disciplined for implementing safety practices the nurses didn't believe were necessary. Second, the nurses found something about Dr. Barksdale "intimidating."

43. In the April 13 meeting, the human resources representative went through a laundry list of the nurses' 'complaints' about him, while DePompei sat silently. The nurses' 'complaints' about Dr. Barksdale, which DePompei and RBC's human resources department concluded warranted disciplinary proceedings against him, included the following:

a. The complaining nurses objected to Dr. Barksdale's practice of insisting on a second safety "timeout" to ensure that everything is in order before an incision is made;

b. The complaining nurses objected to Dr. Barksdale's insistence on having proper trays of surgical instruments prepared before surgery;

c. The complaining nurses objected to Dr. Barksdale's direction that the nurses take responsibility for double-checking to ensure that they have the proper instruments before surgery begins;

d. The complaining nurses objected to Dr. Barksdale's practice of taking off patients' socks before surgery, to ensure they have adequate circulation;

e. The complaining nurses objected to Dr. Barksdale going to the labor and delivery department himself to obtain OB/GYN surgical instruments the nurses refused to or were unable to provide, in a situation where a patient under anesthesia had pus coming out of her vagina;

f. The complaining nurses were upset that Dr. Barksdale—the Surgeon-in-Chief of the hospital—did not always immediately answer their pages;

g. The complaining nurses were upset that Dr. Barksdale complimented and praised new hires;

h. The complaining nurses asserted that Dr. Barksdale took the above actions to "annoy" them;

i. The complaining nurses objected to Dr. Barksdale discussing TikTok videos of African safaris in the operating room, finding discussion of these videos "intimidating;"

j. The complaining nurses objected to and found "intimidating" the fact that Dr. Barksdale—who had recently lost more than 20 pounds (in part due to the stress caused by the racial hostility he faced and RBC's efforts to fire him)—would regularly readjust his pants in the operating room.

44. In summarizing the above discussion, the HR representative explained that the complaint the nurses made against Dr. Barksdale was "the culmination of how they feel about you."

45. The April 13 meeting was one of the most humiliating and absurd moments in Dr. Barksdale's career. Dr. Barksdale explained that the nature of the nurses' complaints about him—which had now been ratified by the highest levels of the organization—revealed exactly the sort of racial bias and hostility he had complained about, and sought RBC's leadership's help in addressing, for well over two years. The nurses' apparent belief that they were smarter, and knew more about surgical safety practices, than the Harvard-trained Surgeon-in-Chief of the hospital, who possessed decades of surgical experience, reflected anti-Black racial bias. The nurses' perception that Dr. Barksdale was "intimidating" them by discussing African safari TikTok videos and readjusting his scrub pants, similarly, reflected anti-Black racial bias. At the conclusion of the meeting, Dr. Barksdale begged DePompei and RBC's human resources department to, for the first time, implement anti-bias training for RBC's staff. He explained that he did not feel the work environment was safe for him where, because of his race, he would be subjected to human resources complaints for implementing safety protocols, engaging in harmless chit-chat about African safari videos, and pulling up his pants.

46. Instead, as a result of the nurses' complaints, RBC formally disciplined Dr. Barksdale. Early in the morning on June 15, 2022, Dr. Barksdale received a call from Dr. Joe Sabik, the Chair of the Department of Surgery, informing him that DePompei intended to discipline him. Dr. Sabik explained that he believed the writeup was "BS," and that he refused to sign off on it. Nonetheless, DePompei proceeded with her plan to formally discipline Dr. Barksdale. She called Dr. Barksdale in for a meeting and delivered him a disciplinary document that threatened him with termination. At the meeting, Dr. Barksdale again explained that the

organization had major problems on issues of race and again suggested that the organization implement anti-bias training to address these concerns. DePompei reacted negatively to those suggestions.

47. By this point, DePompei and RBC leadership had made clear that Dr. Barksdale's colleagues were free to racially harass him, and that by speaking up about what he was experiencing, Dr. Barksdale was only subjecting himself to further discrimination, harassment, and retaliation.

48. Not surprisingly, RBC's culture of impunity for racial harassment resulted in further outrageous incidents. In June 2022, just after disciplining Dr. Barksdale, DePompei received a furious email from a parent of a child who was being operated on. The parent heard nurses, in full earshot of anxious parents of grievously ill children, openly disparaging Dr. Barksdale and another surgeon of color at RBC. The parent reported that four or five nurses were complaining about and badmouthing Dr. Barksdale and the other surgeon for 5-7 minutes. The conversation was happening in the post-op area but was loud enough for parents in the pre-op area to hear. The parent poked her head in to convey that the conversation was being heard, and her disgust and frustration, but the nurses ignored her and continued talking disparagingly about the surgeons. DePompei responded to the parent that such behavior was unacceptable, but ultimately—unlike Dr. Barksdale—UH did not discipline anyone for this outrageously unprofessional behavior.

49. In contrast, DePompei and RBC leadership, which had just threatened Dr. Barksdale with termination, continued to credit the complaining nurses' absurd and discriminatory assertions about Dr. Barksdale. In particular, DePompei criticized Dr. Barksdale for scheduling an emergency surgery (required to take place within 48 hours, for the patient's safety) on a Friday evening, the only open time available, because the complaining nurses

purportedly believed Dr. Barksdale scheduled the surgery to “intimidate” and “retaliate” against them. Similarly, DePompei criticized Dr. Barksdale for documenting an egregious safety violation—in which the staff left the room while a patient was on anesthesia—again taking the complaining nurses’ side that Dr. Barksdale was “intimidating” and “retaliating” against them by documenting the breach of basic safety protocols.

**RBC Further Discriminates and Retaliates Against Dr. Barksdale by Denying Him Adequate Administrative Support and Severely Overworking Him, Causing His Hospitalization**

50. As Surgeon-in-Chief leading RBC’s surgery department, a nationally renowned leader and public speaker, and a practicing trauma surgeon treating Cleveland’s children suffering medical emergencies, Dr. Barksdale had an enormous workload and very significant administrative needs. Through July 2022, Dr. Barksdale had an able assistant who skillfully managed his administrative tasks, so his focus could remain on leading his department, building bridges in the community, and, most importantly, treating his patients.

51. After Dr. Barksdale’s assistant’s retirement in July 2022—and shortly after the events described above, including Dr. Barksdale’s vociferous complaints about the racially hostile work environment RBC subjected him to—RBC assigned an incompetent and unprofessional administrative assistant to Dr. Barksdale. The assistant lacked any of the basic skills and competencies necessary to assist someone with Dr. Barksdale’s myriad, high-level, and essential responsibilities. For example, the assistant was unable to transcribe dictation, had no understanding of medical or surgical terminology, and struggled with basic tasks such as memo-writing, editing communications, processing reimbursements, managing Dr. Barksdale’s schedule or maintaining his memberships and licensing renewals. Moreover, the assistant was unresponsive to patients and colleagues, and often would ignore inquiries.

52. Dr. Barksdale repeatedly raised concerns to RBC leadership about the inadequate administrative support he was receiving, emphasized how the lack of support massively increased his workload and hampered his efforts to perform his job effectively. He requested that RBC hire someone competent to fill the role. In response, the administrator in charge of staff assignments, Morgan Pyzoha (white), accused Dr. Barksdale of being "difficult" and "too demanding." She told Dr. Barksdale that, because his incompetent assistant was "good enough for" Pyzoha, she must be good enough for Dr. Barksdale. This offensive statement echoed the nurses' complaints about Dr. Barksdale, by refusing to acknowledge that he, a Harvard-trained surgeon and the hospital's Surgeon-in-Chief, might have administrative needs that exceeded those of a mid-level hospital administrator.

53. Ultimately, other than accusing him of being "difficult" and "demanding," RBC ignored Dr. Barksdale's concerns and refused to assign him a competent administrative assistant.

54. In addition, at the same time RBC denied Dr. Barksdale sufficient administrative support, Dr. Barksdale's team of surgeons was severely understaffed. Dr. Barksdale repeatedly raised alarms to senior leadership, including DePompei about the alarming staff shortage. He suggested accelerating the timetable to make new, permanent hires, or, at minimum, bringing on temporary "Locum" physicians to ease the staff shortage. His concerns were ignored.

55. As a result, RBC forced Dr. Barksdale—who was in his mid-60s—to take on a grueling, relentless work schedule. At RBC, surgeons rotate through a "Surgeon of the Week" schedule—in which a particular surgeon takes on all emergency surgeries in addition to other responsibilities. The "Surgeon of the Week" must work at minimum 12 hours a day (6 a.m. to 6 p.m.), and often longer, when emergencies take place. He or she cannot count on getting a full night of sleep. Generally, the responsibility rotates, so surgeons have the opportunity to rest and recover after an exhausting stint as Surgeon of the Week.

56. The "Surgeon of the Week" responsibility was always demanding, and especially so in 2023, given the gun violence crisis in Cleveland. Frequent, complex, life-saving emergency surgeries on children wounded by gun violence were devastatingly common.

57. Under normal circumstances, a surgeon at RBC would be "Surgeon of the Week" no more than once a month. In an act of racial discrimination and retaliation, in the second half of 2023, RBC assigned Dr. Barksdale—who was in his mid-60s—to serve as "Surgeon of the Week" *every other week.*

58. Exhausted by his oppressive work schedule, and concerned for the health and safety of his colleagues and patients, Dr. Barksdale escalated his concerns about the severe staff shortage. In late November, he met with RBC's Chairman of Surgery Joe Sabik, to explain that the schedule was "unfair" and "not doable." Sabik responded that Dr. Barksdale was "right" and that he had been "working too much," but that he would have to bring his concerns to DePompei.

59. On November 28, 2023, Dr. Barksdale emailed DePompei requesting that she address the serious physician shortage and his excessive work schedule. He explained that serving as Surgeon of the Week every other week was "physically and mentally exhausting." He wrote that he was "fatigue[d]" and "behind and without an administrative assistant this is exacerbated." He proposed a schedule, beginning the following calendar year, that would involve him serving as Surgeon of the Week a maximum of once a month. He wrote that he was interested in discussing the new schedule with his partners at a meeting this day.

60. DePompei responded briefly, insisting that Dr. Barksdale meet with her and discuss the issue before he would be allowed to make any changes to the Surgeon of the Week schedule or communicate the schedule to his partners.

61. The meeting occurred the following week, on Tuesday, December 5. It was a tense, stressful meeting—which only added to the enormous anxiety, stress, and pressure Dr. Barksdale

already faced. After Dr. Barksdale explained the extreme toll the excessive workload had taken on him, DePompei questioned why Dr. Barksdale had not unilaterally changed the schedule to reduce his workload. Dr. Barksdale understood DePompei was deliberately putting him in an impossible Catch-22 situation. After insisting in writing that Dr. Barksdale not make or communicate any changes to the schedule without her approval, DePompei was now criticizing him for failing to alter the schedule on his own.

62. Two days after the meeting with DePompei, Dr. Barksdale finally succumbed to the grueling, impossible work schedule and hostile work environment RBC subjected him to. After a twelve-hour day, performing a complex operation on an infant in a hot operating room, Dr. Barksdale had a complete physical breakdown. He urinated on himself, his gait became unsteady, his speech was slurred, and he was delirious. Fearful that he was having a stroke, his colleagues rushed him to the emergency room. Dr. Barksdale had a fever in excess of 103 degrees. There, Dr. Barksdale was diagnosed with urosepsis, rhabdomyolisis (severe muscle breakdown), dehydration, and acute kidney injury. He was admitted to the hospital, where he remained for more than three days.

63. Dr. Barksdale's physical symptoms resulted directly from RBC's discriminatory and retaliatory decision to assign him an impossibly grueling work schedule.

64. During Dr. Barksdale's hospital stay, DePompei did not reach out to express wishes for his recovery.

**UH Constructively Discharges Dr. Barksdale**

65. It took months for Dr. Barksdale to fully recover from his illnesses, and the severe physical damage they caused.

66. He returned to a full-time surgical schedule in April 2024.

67. Around that time, RBC publicly posted a job listing for his position: Division Chief of Pediatric Surgery. Dr. Barksdale learned of the posting from a partner, who asked him whether he was resigning. Several people reached out to him to question whether he was leaving his position.

68. The message was clear. RBC could not tolerate having Dr. Barksdale—a Black man who had repeatedly challenged the hospital's mistreatment of him on account of his race—remain employed there.

69. RBC deliberately created intolerable working conditions, as perceived by Dr. Barksdale and any reasonable person in his position.

70. RBC created those intolerable working conditions in a deliberate effort to cause Dr. Barksdale to quit.

71. Accordingly, Dr. Barksdale was constructively discharged. He sought an opportunity at another hospital. He resigned in May 2024, with an effective date in September 2024.

**Dr. Barksdale Has Suffered Damages**

72. As a direct and proximate result of the Defendants' conduct, Dr. Barksdale has suffered severe emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses. Dr. Barksdale has suffered tangible health consequences as a direct and proximate result of Defendants' conduct.

73. As a direct and proximate result of Defendants' conduct, Dr. Barksdale has suffered wage and financial losses and irreparable damage to his career.

74. By the acts and conduct described above, Defendants intended to cause Dr. Barksdale severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Dr. Barksdale.

75. Punitive damages are appropriate because Defendants' conduct was malicious and/or Defendants were recklessly indifferent to Dr. Barksdale's protected rights.

## COUNT I

## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

76. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

77. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

78. UH was Plaintiff's employer.

79. As described above, UH maintained discriminatory employment practices that constitute illegal race discrimination in violation of 42 U.S.C. Section 1981.

80. Plaintiff was subjected to and harmed by UH's discrimination based on his race, Black.

81. As a direct and proximate result of UH's conduct, Plaintiff has suffered damages.

## COUNT II

## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

82. Plaintiff realleges Paragraphs 1 through 75 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

83. Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as reporting racial discrimination.

84. UH was Plaintiff's employer.

85. Plaintiff engaged in protected activity by reporting to DePompei and other high-level executives at UH the racial discrimination and harassment he faced in the workplace.

86. UH took adverse employment action against Plaintiff in retaliation for engaging in this protected activity.

87. Plaintiff was subjected to and harmed by UH's retaliation after he repeatedly reported UH's discriminatory conduct.

88. As a direct and proximate result of UH's conduct, Plaintiff has suffered damages.

## COUNT III
## RACIAL HARASSMENT/HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

89. Plaintiff realleges Paragraphs 1 through 75 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

90. 42 U.S.C. Section 1981 prohibits employers from harassing, or creating a hostile work environment for, an employee based on his race.

91. UH was Plaintiff's employer.

92. As described above, UH subjected Plaintiff to unwelcome harassment based on his race.

93. The harassment unreasonably interfered with Plaintiff's performance of his work duties.

94. The harassment was severe or pervasive to a degree that it altered the conditions of employment and created a hostile or abusive work environment.

95. Throughout his tenure, Plaintiff repeatedly made UH aware of the hostile environment it was subjecting him to, and UH failed to take adequate remedial action to correct the harassment.

96. As a direct and proximate result of UH's conduct, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in his favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff reinstatement and/or the value of all compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys' fees, costs, and disbursements; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Dated: September 25, 2026

Respectfully submitted,

/s/ *Charna E. Sherman*

Charna E. Sherman
**CHARNA E. SHERMAN LAW OFFICES CO., LPA**
30799 Pinetree Rd.
No. 356
Cleveland, Ohio 44124
Phone: (216) 453-9133
csherman@charnalaw.com

Linda D. Friedman (*Pro Hac* to be filed)
**STOWELL & FRIEDMAN LTD.**
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888
Lfriedman@sfltd.com

Matthew J. Singer (*Pro Hac* to be filed)
**MATT SINGER LAW LLC**
77 W. Wacker Dr.
Suite 4500
Chicago, Illinois 60601
Phone: (312) 248-9123
matt@mattsingerlaw.com